All right. Our fourth case for this morning is United States v. Larry Bentley. Mr. Brindley. May it please the Court, my name is Beau Brindley and I represent the defendant appellant Larry Bentley. Larry Bentley appeals from the denial of his motion to suppress evidence on two bases. One, that the canine unit whose alert provided probable cause was not a well-trained dog, according to Supreme Court rules. And second, because the officer lacked a reasonable suspicion to pull over the vehicle based on a lane violation. Mr. Bentley has also appealed the sufficiency of the evidence. I would like to begin this morning by addressing the question of the drug detection canine unit. So why is it that the district court was mistaken to think that the dog met the minimum criteria for allowing that evidence to come in with the field accuracy rate of a little below 60% and all the rest of it was really weight evidence? I mean, the jury finds out once it comes in that Lex has his problems with detecting lack of drugs and he alerts too often and all the rest of the things that you've pointed out. But why aren't most of those things under Harris items that go to the weight? I think the reason that, I don't think that we can just focus solely on the percentage and say this number is enough. Because 60% would mean different things under different contexts depending on how many times the dog did not alert at all to vehicles. But you may be right, I mean the Supreme Court says in Harris it's an all the circumstances kind of situation. In the totality of the circumstances consideration, it's not just the training, it's not just the field. You look at everything that's available to you. And in our case here with Mr. Bentley, we had a wealth of information about this dog that we were able to put forward. And I think that one of the things that is important not to get away from, I think the most important thing, is that in Cabayas the Supreme Court said you define the well-trained dog by the fact that that dog will not expose to search items that should remain private. And here with this dog, he, when confronted with a situation where the vehicles contain no evidence of drugs whatsoever that can be found, even after full search and interrogation of the people who are in the car and the officer's willingness to really try to corroborate this dog, we had lots of evidence of that. In those circumstances where there's no evidence, over 80% of the time, 83.7% of the time, this dog alerts. Well, no, I understand that. But on a totality basis, what this district court judge does, and of course the question before us is whether this was appropriate, is kind of in keeping with Harris, he lets the government submit the evidence about the dog's training, about the dog's success rate, both in controlled settings, out in the field. Bentley challenges all those findings. He cross-examines everybody. He cross-examines the founder of this organization, CTI. And the judge weighs all of this, makes a decision to let it come in. And, of course, Lex's alert is, I think, critical to the finding of the concealed compartment. That much is pretty clear. Yes, Your Honor. I think the government conceded that they wouldn't have probable cause to look for it without Lex's alert. And in terms of whether these things just go to wait, I think ultimately, in terms of determining the admissibility of the evidence to begin with, you have to determine whether he's a well-trained dog by the CABAYA standard. And to do that, you have to consider all of these things. One of the problems with the district court's ruling here was he really talked about the number, and he didn't specifically address any of the problems. Lex's problem isn't just, although I think the biggest one is, he basically alerts every time. That's almost 100 percent alert rate. And when you have a dog that alerts basically 100 percent of the time, and then you have – Well, it's not 100 percent, but the other thing is the pool of cases that he's given. I think the district judge placed some importance on this. Isn't a random array of people in the population at large – the police aren't just stopping every third car and having the dog walk around it. They're stopping cars that are already worrying them for some reason or another. That's actually another part of your appeal. In fact, should this car have been stopped? Yes, indeed, Your Honor. I think that the – But it's not a random set, which means that maybe the percentage of positive alerts should be higher than – It maybe should be higher, but 93 percent is the actual number, I think, of how often he alerts. That is a huge number. And we actually went and gave you, in our initial brief, we went and gave you the statistics on the consent searches. When these officers in Bloomington get consent searches from people to get in cars, for similar reasons, for similar suspicions, they're at 28 percent. Anything coming out of those searches, 28 percent. Doesn't it strike you that that's actually fairly predictable, too, though? I mean, if somebody has given consent to a search, it seems logical to me that the person either thinks the police are not going to find the hidden drugs or maybe they know, I didn't bring my drugs with me today, or I don't have anything. There may be some sense in that, Judge, but the idea that the Bloomington Police Department can spot 93 percent of the time they're able to spot a person just on the basis of hunches, I think that stretches the bounds of the imagination. And there's a lot done, and we go over all this in the briefing to try to corroborate Lex. If there's a little leaf material on the floor that could be marijuana, he gets points for that. But ultimately, I think this comes down to, at the end, a consideration of the problems Lex has in training, combined with the 83.7 percentage figure, that's how often he alerts when there is nothing. Now, of course, the government and the Supreme Court has talked about, well, it's always possible there could have been an odor there before. But 83 percent of the time, he's exposing items to search that don't have a right to be searched. Those are the innocent items. There is nothing in there. That's what Caballos was worried about. And I don't think Lex can meet that test. And the district court here did not address any of the specific problems Lex had, and they weren't just with the field. Lex failed two objective tests conducted by a government expert to prove his reliability. In this case, he said the COBE tests or something. Nope, Wendell, nope. Nope did the tests. And he failed them both. And these were tests that they admitted were easy tests. Nine days before he searched Mr. Bentley's car, which was replete with various plastic bags and things, he alerted the plastic bags in training, and the only thing they did was pull on his leash really hard. They didn't do the kind of training where they just exposed him to bags and see if he would alert to them or not. They didn't do that. So he had a problem with that in terms of his training. He has the problem that comes from the failure to get any kind of a test to determine the low threshold for what he, if he's so sensitive, he will alert to the $5 bill you have in your pocket, Your Honor. Then he can't separate odor emitting from non-odor emitting. And they didn't prove that either. And when you have this 83% figure and the definition of cabios and these problems, the district court at the very least has to address them before just saying, oh, 59% is good enough for me because they said 62% was good enough. What occurred before Lex showed up? What's that? What occurred? What period of time and what occurred before Lex came on the scene? They pulled Mr. Bentley over for this lane violation, which is briefed in excess in the briefing you already have. The police had approached him. They were filling out what they called a racial profiling form, and they were admitting they wanted to be hoping the dog would get there before they got it done. Okay, so you think they're just dragging their feet a little bit, writing a warning, that sort of thing? Yes. It was just about seven minutes, though, wasn't it? It wasn't a long time, no. The officer admitted he was hoping that it was going to last long enough to get the dog there, but it was not a long time that they were there waiting. That's certainly true. And then the officers arrive, and they sort of walk around the car, and the canine gets there, and they bring him around. Now, I think everybody admits from the government to the defense, everybody was in agreement until Lex came on the scene, there wasn't probable cause to get in that car, and this was not a person who was going to consent to that search. There was a tire in the back. There was a tire in the back seat, yes. Back seat, which is an unusual place for a tire. That is an unusual fact. Which might cause someone to wonder about why is it in there. You could say, well, it's flat, and I've got to take the gas station. Well, he had borrowed the car, so he might not even have access to be able to ask that question by the time he got it from the person that would know. But ultimately, you needed Lex to make the determination, and we didn't get an answer from the judge on each of these problems with Lex, and this is a very problematic dog. The other cases... Well, did he alert to Lex under the car? He just alerted. He alerted up by the front of the car. He wasn't underneath the car, and then they went and searched the whole car. If you look at the video and the images that we have, you'll see that he alerts toward the front of the vehicle on the driver's side. He's not actually around alerting underneath the vehicle. But based on the fact that we have all these problems with his training, and the other cases don't involve a dog who's alerting over 80% of the time when exposed to no drugs at all. So it looks like I'm out of time. I don't concede any points on the other issue, but I wanted to address this one. We'll assume your briefs cover those. Thank you. They do, Your Honor. Mr. Pelletieri. May it please the Court, John Pelletieri from the Department of Justice on behalf of the United States. Florida v. Harris confirms and establishes that there's a totality of the circumstances test to determine whether a dog alert establishes probable cause to search an automobile. It does, but I have to tell you, Mr. Pelletieri, first of all Lex reminds me of bad jokes about, you know, what do you call the person who graduates last in his medical school class? Doctor. I mean doctor. And so Lex may be called a canine drug detection dog, but he's pretty poor at the job if he can't distinguish between no drugs and drugs at the rates that are set forth in the briefs here. We respectfully disagree. First of all, the Supreme Court of Florida v. Harris establishes that the paramount consideration is performance in controlled environments. And he doesn't even do that well.  No, he does that very well, Your Honor. In controlled environments, he was certified. He received advanced certification. No, I'm talking about the NOPE test. The NOPE test was after the search in this case was after, and that was in two instances that wasn't a full-on certification. It wasn't during the practice. It's entitled to some weight, but very limited weight, because it wasn't known to the officers at the time. And when they're making this determination as to whether this dog establishes probable cause, it's entitled to some but very little weight. If you look at his certification prior to and training prior to the search in this case, during 2010 he conducted 418 practice narcotic searches. He had two false positives, meaning that there were no drugs there, but he said that there were, and 15 false negatives, meaning there were drugs there, but he said there weren't there. So is it the government's position that a dog who's perfect at the school but that never gets it right out in the field, that always alerts when there are no drugs or fails to alert when there are drugs, is a perfectly good dog to use for a search? Well, if the only evidence that's presented is this type of perfect performance in training, then that would be no. No, but did you also introduce evidence that he's terrible in the field? I won't say zero. I'll say he gets it right 10% of the time when there are drugs and he fails the other 90% of the time. Field records might be of relevance but are of best marginal relevance. That seems crazy. I mean, that's where he's being trained to work. That's the precise teaching of Florida B. Harris. We want doctors to get an A in their human anatomy class, but if they kill all of their patients, that's actually irrelevant. That's the precise teaching of Florida B. Harris, is that the field records are not probative enough because we cannot know whether if a dog alerts and drugs are not found, whether it was a false positive. Well, I think you're over-reading Florida v. Harris. I mean, I think it's saying that make your best case, look at all the circumstances. There might be a reason why a dog alerts and the officer doesn't spot what he's alerting to, but I don't think it means that the field is just beside the point. No, absolutely not, Your Honor, and that's not our position. It's not beside the point. It's entitled to some weight but little weight, and in this case it doesn't do the work that it would need to do to rebut or to overcome all of the other evidence in this case, which is the evidence of his training and performance and all of the evidence that we presented. But there's some troublesome evidence too. Officer Shively rewards him every time he alerts. The reward comes before we find out if it was a false positive or a true positive. This dog is trained to be rewarded with a bite toy. In training, that's what he was rewarded to expect. Right, this hose with the sock in it, I know. Yes, and he is not given that every time he alerts in the field. I thought the record said he was given. No, the record says that he performs a variable reward schedule where sometimes he does and sometimes he doesn't. It's not the same thing that he's trained to recognize when he alerts. And Beezer, who testified, said that this is an appropriate method of conduct for a handler. So there's a variable reward with a specific reward being the toy that he's trained with and on other occasions praise. And Mr. Bentley is basically embarrassed at this 93% alert rate in the field. He says, I don't like to see that. I wouldn't say he's embarrassed. He says, I don't like to see that. On first blush, he was concerned, and then he talked. He interviewed Officer Shively and the Bloomington Police Department, and then he learned of the context in which this dog was used, which is not general interdiction. It's when there's some suspicion of criminal drug activity. And after that, he was not worried, and that assuaged his concerns. What was the quantity of drugs found in that box under the car? Almost 15 kilograms. I don't know much about sniffing. How many? Almost 15 kilograms. About sniffing. But 15 kilograms, I would think, is a pretty substantial target for scenting. And that's why it's one thing if you find a couple ounces or something, but if you've got 15 kilograms, I don't even know what it smells like, but I might be able to smell that. That's why the alert with that amount doesn't seem out of line. I don't know. He did smell and he did alert. I know, but it seems to me that with that quantity of drugs, it's not hard to get an alert. Well, the question is whether his overall, everything known to the officers at the time when they conducted that search, gave them confidence, and it's a totality of the circumstance, that it would be positive. But so he, to alert, to say that, well, he doesn't have a very good record of alerting, but that one, I don't know whether they base it on quantity. I don't know anything about the training. In our view, he has a very good record of alerting. Now, even if you look only at the field records in this case, he conducted 96 searches. He did alert 89 times, and that was explained by the context, and Beezer interviewed them in terms of how he's used. But of those 89 alerts, drug presence was corroborated on 53 occasions. That's almost 60%, about 59.6%. Yeah, but that's a pretty huge gap. So let's, don't we have a case where we need this guy, this dog, for probable cause? Oh, yes, we do need this dog for probable cause. There's other circumstances. This is basically a 100% dog. So if you've got a police department that's a little shy of probable cause, by either profiling or whatever, in this case, kind of a marginal waving of a lane situation, and you've got basically a dog that never fails, you can bring this dog out every time, practically. You're only going to miss 7%. Well, this court has held that a dog with a field alert rate of finding positives 62% of the time is sufficient for probable cause. That's the Lymaris case. But that's not the alert rate. I mean, the alert rate is close to 100%. And the problem is we would never see the cases where the dog alerts and they search the car and nothing's there because people, you know, because no criminal proceedings are brought. So we see the cases like this one where, after the fact, we discover that there was a huge amount of cocaine in the car, the 15 kilos. Well, the alert rate in Lymaris was very high. There were, I believe it was a 93% alert rate. And in 31%, and the court said if we assume that 62% is only when he was accurate, that's enough for probable cause. So that may have been a mistake. I mean, you know, the truth is it makes probable cause easy to manufacture. I'm not sure there's any potential for manufacture here. There's no suggestion of anything but good faith, and good faith training of this dog, and his very positive behavior during training, during using high standards that are accepted throughout the industry, and his certification, and then his field records, which this court has found sufficient. So if this court has found sufficient, that type of field records, it's plainly not enough. And that's what I'm saying, should we rethink that? Because if you can bring out a dog that's going to alert to 93% of cars, and I won't exaggerate, so 93% of cars, of course you're only going to prosecute in the group that wind up being a problem. Are we seriously adding to the evidence that would either support or undermine probable cause with such a dog? Yes, because he's been shown to be corroborated 60% of the time, and we don't know whether the other 20-some-odd percent or 30-some-odd percent is a false positive or not. It could have been a true positive. We just don't know. The drugs could have been well hidden in that car. There could have been marijuana being smoked a few hours before, and we don't know, and there was no admission by the occupants of the car. That dog may have very well been accurate in that additional 30% of the time. We don't know. That's why we have to concentrate and focus on the controlled setting, and that's what Florida v. Harris teaches. And Lemaris was decided before Florida v. Harris where the court only looked to the field records. I'm not sure that evidence of training and certification was offered in that case, and even in that context, without these very probative and very supportive field training and certification records, the court found that only that field data was sufficient. Okay. Thank you very much. Thank you, Your Honor. Anything further, Mr. Brindley? If I could just have a brief minute, Judge. A couple of things quickly. First of all, in terms of Beezer's testimony, it's important that Beezer's testimony testified you should never give him the gifty toy out in the field because you don't know if he's getting it right or not. The defense expert testified that too. Shively is shown on video doing it. He says that he does it. He always rewards him one way or another, but he did what he wasn't supposed to do, so there's a problem there. What's not discussed in Lemaris in the same way that we've discussed it here is the well-trained dog definition of cabios and the percentage of times that the dog is exposed to no objective evidence of drugs and still alerts. That didn't come up in Lemaris, and that's what's important in cabios, and I think we've gotten away from that. If we focus on that figure in this case with this dog and all of his problems, this dog cannot be a well-trained dog. And when we consider that the district court didn't address any of these specific training problems, the opinion is insufficient. This is not a well-trained dog pursuant to cabios. This is an excuse to search the car, not a justification. That's what the numbers tell us. Thank you, Your Honor. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.